# In the United States District Court for the District of Utah, Central Division

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**LAVETTE MICHELLE BROWN, OLIVER DENNIS SEELEY, and GABRIEL QUINTEROS.**<br><br>**Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 2:05 CR 533 JTG** |

This matter comes before the court on a Motion to Suppress Evidence filed by defendant Lavette Brown ("Brown"), defendant Oliver Seeley ("Seeley"), and defendant Gabriel Quinteros ("Quinteros"). Defendants allege that the detention after a traffic stop was illegal, and the trooper's questions during the illegal detention and arrest was also illegal and fruit of the poisonous tree. An evidentiary hearing was held, and a video tape exhibit was entered into evidence by the government. A transcript of the hearing was prepared, and all parties have submitted briefs.

Being fully advised, and after due consideration, the court Grants defendants' Motion to Suppress.

## STATEMENT OF FACTS

On June 29, 2005, Seeley was driving a sports utility vehicle northbound on Interstate 15 through southern Utah. There were three other occupants in the vehicle – Brown, Quinteros, and Valarie Lynn Cook ("Cook"). Sergeant David Bairett was on patrol with Trooper

McWilliams, headed southbound on Interstate 15. At about 10:00 a.m. Sgt. Bairett observed the defendants' vehicle headed northbound at a high rate of speed. Sgt. Bairett radar clocked the vehicle at 91 miles per hour. Sgt. Bairett then made a traffic stop because of the defendant Seeley's excessive high speed. Upon stopping the vehicle, Sgt. Bairett approached the passenger side door and spoke to the driver through the passenger side window, and Trooper McWilliams approached the driver's side rear area as back up. Sgt. Bairett immediately determined that the vehicle was a rental car, and asked the driver (Seeley) for his driver's license and the rental agreement for the car. Seeley produced his driver's license, but had trouble locating the rental agreement. While Seeley was looking for the rental agreement, Sgt. Bairett questioned him about his final destination and the purpose of his trip. Seeley stated that they were headed to Provo to visit his son who was attending summer school at Brigham Young University. Sgt. Bairett believed defendant's statement that his son was in summer school at BYU was suspicious because he understood that the colleges in the Provo area started and ended during the regular school year, with no summer school. However, on cross examination, Sgt. Bairett admitted that it would be reasonable for Brigham Young University to have summer school at that time of year. Sgt. Bairett continued to press questions about Seeley's son and whether he was in summer school, which caused Brown to become agitated at the trooper's request for so much personal information.

After a few minutes, Seeley located an outdated rental agreement, whereupon Sgt. Bairett asked him to exit the vehicle. Seeley was directed to remain at the rear of the vehicle with Trooper McWilliams, while Sgt. Bairett went to his vehicle to request the dispatch officer to run a criminal history check to determine whether Seeley had any outstanding warrants, as

well as a check to determine whether Seeley's driver's license was valid. The report to Sgt. Bairett was that Seeley had no outstanding warrants and his driver's license was valid. Sgt. Bairett did not request a so-called "10-28" check to determine the current status of the vehicle. At the evidentiary hearing Trooper McWilliams testified that it is standard procedure to call in all three requests, which would include a check on the status of the rental vehicle. While checking the rental agreement on the vehicle which Seeley had produced, Sgt. Bairett noticed that the agreement had expired eight days earlier. Sgt. Bairett then returned to question Seeley about the expired rental contract, and was informed by Seeley that he had renewed the contract for a second time the day before and that the current contract was somewhere in the vehicle. Seeley told Sgt. Bairett that Budget Rental if called would confirm the extension of the contract. For some reason, Sgt. Bairett did not request Seeley to search further in order to find and produce the current contract from the vehicle. Also Sgt. Bairett did not call Budget Rental or request dispatch to confirm whether the contract had been extended, and he failed to run a "10-28" inquiry so as to check the license plate and the status of the vehicle registration, which would have shown whether the car was reported stolen. At the evidentiary hearing, Sgt. Bairett testified that he only runs such checks when he "feels" there is a need. Sgt. Bairett testified that the reason he asked Seeley to exit the vehicle was because the other passengers were acting nervous. In this regard, Sgt. Bairett thought Quinteros and Cook appeared to be nervous because they were looking straight ahead with their arms folded.

After receiving the aforesaid information from radio dispatch, Sgt. Bairett resumed his questioning of Seeley about his son and the purpose of his visit to see his son. Sgt. Bairett also began questioning Seeley about the occupants in the vehicle and determined to speak

with the passengers. Sgt. Bairett testified that he did this because he wanted to clarify the issue of the renewed rental agreement with Brown. However, before questioning Brown, Sgt. Bairett asked Seeley for further information about his son, including the name of his son. Seeley responded that his son's name was "Aaron, Kevin Aaron", and pointed to a tattoo on his arm. (Government Exhibit: Video Tape.) When Sgt. Bairett questioned Brown about the rental agreement, she confirmed that it had been renewed the previous day by her husband. Brown offered her cellular phone to Sgt. Bairett in order to call Budget Rental about the renewal of the contract. Sgt. Bairett refused, and still did not ask for the current rental agreement to be produced. Rather, Sgt. Bairett began asking Brown more detailed questions about the purpose of their trip and further questions regarding their son in Provo. By this time Brown became agitated with Sgt. Bairett's questions and no longer wanted to speak with Sgt. Bairett.[1] Sgt. Bairett told Brown not to go to or to speak to her husband as she had attempted to do. Brown apologized, and stated that she had medication which she needed to take every morning, but that she had not eaten yet that morning. She informed Sgt. Bairett that she needed some food first in order to take her medication.

Sgt. Bairett testified that he was still concerned and suspicious because Quinteros and Cook continued to appear nervous, in that they were looking straight ahead with their arms folded. In addition, Sgt. Bairett believed that he had received "differing stories" from Seeley and Brown regarding the enrollment status of their son after his extensive questioning. Sgt. Bairett also testified that a single ordinary air freshener in the car appeared unusual, and that he still was

[1]Sgt. Bairett had an assertive demeanor and aggressive tone toward Brown, demanding that she stand only where he told her to stand, to answer "his" questions, and refused her attempts to terminate his inquiry. (Gov't Ex: Video Tape.)

not satisfied that the rental agreement for the vehicle had been renewed. At this time, Sgt. Bairett still had not requested Seeley to further search for the current rental agreement, and he had not requested any type of a vehicle check from dispatch about the status of the vehicle.[2]

During all of the questioning, Sgt. Bairett continued to retain possession of Seeley's driver's license, and continued to keep it during the entire course of the stop. In addition, at no time during the stop did Sgt. Bairett issue Seeley a speeding citation.[3]

Sgt. Bairett next proceeded to ask Seeley if there was anything in the vehicle that he needed to know about and if he could search the vehicle. Seeley asked what Sgt. Bairett thought would be in the vehicle. Sgt. Bairett said that he had a suspicion of illegal drugs, and asked Seeley whether marijuana, cocaine, methamphetamine, or heroin were in the vehicle. Seeley stated that there were no illegal drugs in the vehicle. Sgt. Bairett then asked Mr. Seeley if he could search the vehicle, and explained that "in my training and experience with the discrepancies in the stories, the nervous behavior I had observed, that in this area it's common to find people transporting illegal drugs and that's why I wanted to search his vehicle." Sgt. Bairett stated that he believed that there were illegal drugs in the car because

> Your story and your wife's story are not making sense to me. I'm getting different answers from the two of [you], different responses, and you're really nervous. Something is going on here. In my opinion something is going on here. Usually, when I find people coming out of Southern California, which is probably if not the top distribution area in the country – its within the top three – I find in this situation they're hauling illegal drugs. That's why I ask, are there any drugs

---

[2]Sgt. Bairett was ordered by the court to produce, and supplement the record from the evidentiary hearing, the dispatch tape concerning this stop. He failed to produce or procure the dispatch tape as ordered. Also, the United States Attorney's Office has failed to produce the tape or to provide an explanation to the court for Sgt. Bairett's failure to produce the tape.

[3]At no point during the stop did Sgt. Bairett inform Seeley that he was free to leave.

in the vehicle?

(Gov't Ex: Video Tape.)

Seeley denied Sgt. Bairett's request for a consensual search and stated that he did not want his vehicle searched. After Seeley told Sgt. Bairett unequivocally "no" to his request to search, Sgt. Bairett informed Seeley that if he did not want him to search his vehicle then he was going to call for a drug dog and that Seeley would have to sit and wait for the dog. Seeley responded by saying, "if that's the route you are going to take, obviously I want you to search my vehicle."

Sgt. Bairett had the remaining passengers exit the vehicle, and he began his search. At this point, Sgt. Bairett noticed two black lock boxes located on the floor of the backseat area. Sgt. Bairett immediately began his search by reaching into the back seat passenger area and opened the lock box with the key in the lock. Inside the lock box Sgt. Bairett discovered false identification documents. Sgt. Bairett immediately exited the vehicle and instructed Trooper McWilliams to take the defendants into custody.

## STANDARD OF REVIEW

The Tenth Circuit Court of Appeals reviews evidence on a clearly erroneous standard in the light most favorable to the district court's findings, but the ultimate determination of reasonableness under the Fourth Amendment is a question of law and is reviewed de novo. *United States v. Cervine*, 347 F.3d 865, 868 (10th Cir. 2003); *see also United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005); *United States v. Fernandez*, 18 F.3d 874, 876 (10th Cir. 1994).

## ANALYSIS

### *Investigative Detention*

A traffic stop is a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." *Bradford*, 423 F.3d at 1156 (*quoting Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). The Tenth Circuit has held that a routine traffic stop is more analogous to an investigative detention than a custodial arrest, and therefore will "analyze such stops under the principles developed for investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir.1998). The determination of the reasonableness of an investigative detention requires a dual inquiry: first "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Bradford*, 423 F.3d at 1156 (*quoting Terry*, 392 U.S. at 20, 88 S.Ct. 1868); *see also Cervine*, 347 F.3d at 868; *United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994); *United States v. Dewitt*, 946 F.2d 1497, 1501 (10th Cir.1991).

### *Initial Stop May Become an Unreasonable Detention*

A traffic stop is valid under the Fourth Amendment if the stop is made after an observed traffic violation. *Bradford*, 423 F.3d at 1156; *see also United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995).

In the case at bar, justification of the initial stop is not at issue because defendants

do not deny the propriety of the initial stop.[4] Rather, defendants argue that the initially valid stop evolved into an unreasonable detention. This court agrees.

The Tenth Circuit has declared that "an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'" *Cervine*, 347 F.3d at 870-71 (10th Cir. 2003) (*quoting United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir.1999)); *see also Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983).

With respect to investigative detentions of automobiles, the Tenth Circuit Court of Appeals has held that an officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. *United States v. Fernandez*, 18 F.3d 874, 877-78 (10th Cir. 1994); s*ee also Bradford*, 423 F.3d at 1156 (*quoting United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997)); *Cervine*, 347 F.3d at 871; *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001). However, "[w]hen the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning." *Fernandez*, 18 F.3d at 878; *see also United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir.1988).

---

[4]While defendant Seeley does not challenge the propriety of the initial stop based upon the traffic violation for speeding, Seeley raises the issue of pretext for the stop. However, a pretextual stop only occurs when an officer uses some legal justification to stop a person or vehicle in order to investigate unrelated criminal matters for which the officer lacks reasonable suspicion. *Fernandez*, 18 F.3d at 876 (10th Cir. 1994); *see also United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir.1988). Whether an investigative detention is unconstitutional as a pretext turns not on "whether the officer could validly have made the stop, but whether under the same circumstances a reasonable officer would have made the stop in the absence of the invalid purpose." *Id*. at 876-77 (*quoting Guzman*, 864 F.2d at 1517 (additional citations omitted)). In the case at bar, defendant has failed to produce evidence that a reasonable trooper, or any trooper for that matter, would not have stopped a vehicle "clocked" with radar at 91 mph on a road with a limit of 75 mph.

***Questions During Initial Stop***

The Tenth Circuit has held that during the initial stop an officer may ask routine questions about the driver's travel plans. *Bradford*, 423 F.3d at 1156; *see also Williams*, 271 F.3d at 1267 ("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."). However, once the purpose of the traffic stop is completed, further detention for purposes of questions unrelated to the initial traffic stop is impermissible unless: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter. *Cervine*, 347 F.3d at 868-69.

In the case at bar, Sgt. Bairett stated to Seeley that he suspected illegal drugs were in the vehicle, and said that he wanted to search the vehicle because:

> Your story and your wife's story are not making sense to me. I'm getting different answers from the two of [you], different responses, and you're really nervous. Something is going on here. In my opinion something is going on here. Usually, when I find people coming out of Southern California, which is probably if not the top distribution area in the country – its within the top three – I find in this situation they're hauling illegal drugs. That's why I ask, are there any drugs in the vehicle?

(Gov't Ex: Video Tape.) Sgt. Bairett proceeded to ask Seeley if drugs were in the vehicle, specifically naming several types, and if large amounts of money would be in the vehicle. In this regard, the Tenth Circuit has ruled that a trooper must have reasonable and articulable suspicion for questioning the driver about drugs or weapons. *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th cir. 1995) (*citing United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991)). "In other words, the [trooper's] questions must concern the conduct that he has found objectively suspicious." *Id*. (citing 3 Wayne R. LaFave, Search and Seizure § 9.2(f), at 375-76 (2d ed.

1987)). Furthermore, in *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993), the court stated that "[w]hen [the trooper] questioned the defendant about matters unrelated to the initial traffic stop, the detention entered a new phase."

***Objectively Reasonable and Articulable Suspicion***

The Tenth Circuit has stated that

> a defining characteristic of our traffic stop jurisprudence is the defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question, thus giving rise to objectively reasonable suspicion that the vehicle may be stolen.

*Fernandez*, 18 F.3d at 878 (*citing Guzman*, 864 F.2d at 1519 (no reasonable suspicion where officer received proper license and registration and confirmed car not stolen)). However, "objectively reasonable suspicion that the vehicle may be stolen" does not translate to reasonable suspicion of drug activity. *See Fernandez*, 18 F.3d at 881 (finding that the officer's suspicion that defendant was intoxicated became irrelevant when he did not perform any sobriety tests on defendant). In *Royer*, the United States Supreme Court stated that "the scope of the detention must be carefully tailored to its underlying justification." 460 U.S. at 500, 103 S.Ct. at 1325.

In the case at bar, Sgt. Bairett's investigation into the status of the vehicle resulted in a reasonable explanation regarding the renewal of the vehicle, followed by an independent confirmation from Brown regarding the renewal of the contract. In addition, defendant Seeley stated that the new rental agreement was in the vehicle and that it could be retrieved. Not only did Sgt. Bairett fail to check out these matters, but he failed to utilize those procedures routinely used by law enforcement and established for the explicit purpose of checking vehicles for proper ownership and status for stolen vehicles. Sgt. Bairett at no time ran a "10-28" on the vehicle, even though he was in contact with dispatch and requested a "10-26" and a "10-27". Sgt. Bairett

testified that he had an ongoing uncertainty as to the status of the vehicle, yet he did not run a "10-28" because he did not "feel" like it. Trooper McWilliams testified at the evidentiary hearing that he was trained to always run all three and could not recall a reason not to. (McWilliams was trained by Sgt. Bairett.) In this regard, the court finds that Sgt. Bairett failed to pursue reasonable articulable suspicion by not investigating the status of the vehicle. Rather, he chose to further detain the defendants with questions wholly unrelated to the traffic stop or the status of the vehicle.

***Nervousness as Basis for Reasonable Suspicion***

The Tenth Circuit has repeatedly held that nervousness is of "limited significance in determining reasonable suspicion . . . " and that "'in all cases of this kind must be treated with caution. It is common knowledge that most citizens, . . . whether innocent or guilty, when confronted by a law enforcement officer . . . are likely to exhibit some signs of nervousness.'" *Fernandez*, 18 F.3d at 878 (*quoting United States v. Millan-Diaz*, 975 F.2d 720, 722 (10th Cir. 1992)); *see also United States v. Peters*, 10 F.3d 1517, 1521 (10th Cir. 1993) ("While a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a [d]efendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials."); *see also United States v. Wald*, 216 F.3d 1222, 1227 (10th Cir. 2000) (holding nervousness is "of limited significance" in determining whether reasonable suspicion exists). In addition, the court has stated that a district court's "heavy reliance on nervousness as an important factor establishing reasonable suspicion is even more troublesome given the complete lack of evidence in the record that [a trooper] had any prior knowledge of [defendants] to make an evaluation of their behavior." *Fernandez*, 18 F.3d at 879. In

*Fernandez*, the court said that it "[did] not understand how [the trooper] would know whether [defendants were] acting nervous and excited or whether [they were] merely acting in their normal manner. Rather, [defendants] appearance to [the trooper] is nothing more than an 'inchoate suspicion or hunch.'" *Id.* (*quoting United States v. Bloom*, 975 F.2d 1447, 1458 (10th Cir. 1992)).

In the case at bar, Sgt. Bairett testified that he had received training on subject indicators that signify criminal activity, stating that the subject indicators include "nervous behavior," such as tremors, shaking, avoiding eye contact, and restating questions before they answer them.[5] Sgt. Bairett testified that the nervous behavior that he relied upon was that the passengers sat still with their arms folded and did not make eye contact with him, and that Seeley and Brown paused before answering him, and asked for questions to be repeated occasionally while standing on the side of a busy interstate highway. The court rejects these observations as not at all indicating reasonable articulable suspicion.

***Geographical Location as Basis for Reasonable Suspicion***

The mere fact that a rental car was procured in California does not make its driver a drug dealer, or give rise to a reasonable suspicion. *See Bradford*, 423 F.3d at 1157 (*quoting United States v. Beck*, 140 F.3d 1129, 1132 (8th Cir. 1998) ("We do not think that the entire state of California, the most populous state in the union, can properly be deemed a source of illegal

---

[5]Sgt. Bairett testified that seventy percent of the individuals he pulls over do not exhibit any nervous behavior and have no reason to be nervous. However, Trooper McWillaims testified that he always ensures that his video camera is recording because individuals can get so nervous upon seeing the flashing lights that "people go right into the median with me right behind them and I am not even chasing after them."

narcotics such that mere residency in that state constitutes a factor supporting reasonable suspicion.”)).

In the case at bar, Sgt. Bairett’s belief that Seeley, being a resident out of Southern California, constitutes a legitimate factor to support reasonable suspicion is legally unsupported and flat incorrect. In addition, his “hunch” lacked any objective or even legitimate subjective support.

***Totality of the Circumstances as a Proper Test in Determining Objectively Reasonable and Articulable Suspicion***

The Tenth Circuit has held that while many aspects of a defendant’s behavior, standing alone, would be insufficient to establish reasonable articulable suspicion, the standard of the “totality of the circumstances” is the appropriate test to determine whether the trooper had a “particularized and objective basis for suspecting legal wrongdoing.” *Bradford*, 423 F.3d at 1157 (citing *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)).[6]

---

[6]In *Bradford*, 423 F.3d at 1157, the court also noted:
Some items motorists might possess must be “outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous,” *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997), including cellular telephones. *United States v. Williams*, 271 F.3d 1262, 1269 (10th Cir. 2001). Likewise, wrappers from fast food establishments strewn about a car may indicate slovenliness or the need to travel while eating, but do not by themselves indicate a driver smuggling contraband. *See United States v. Beck*, 140 F.3d 1129, 1138 (8th Cir. 1998) (“We also conclude that the mere presence of fast-food wrappers in the Buick is entirely consistent with innocent travel such that, in the absence of contradictory information, it cannot reasonably be said to give rise to suspicion of criminal activity.”); *Wood*, 106 F.3d at 947 (holding suspicion associated with possession of fast-food trash “is virtually nonexistent”); *Karnes v. Skrutski*, 62 F.3d 485, 496 (3d Cir. 1995) (noting fast food wrappers “have become ubiquitous in modern interstate travel and do not serve to separate the suspicious from the innocent traveler”).

In the case at bar, the government has failed to show that Sgt. Bairett had a particularized and objective basis for suspecting legal wrongdoing under the totality of the circumstances. The scope of the detention in this case was in no way carefully tailored to its underlying justification of the stop or Sgt. Bairett's initial objectively reasonable and articulable suspicion that illegal activity had occurred. Sgt. Bairett apparently pursued an "inchoate suspicion or hunch" based upon unsupported personal beliefs rather than objective reasonable suspicion. Continued detention of defendant must be based upon "specific and articulable facts and rational inferences drawn from those facts [that give] rise to reasonable suspicion." *Fernandez*, 18 F.3d at 878 (*quoting United States v. Werking*, 915 F.2d 1404,1407 (10th Cir. 1990)). No such specific and articulable facts have been established by the government in this case. Thus, this court finds that the detention exceeded Constitutional limits as set forth in the jurisprudence of the Tenth Circuit.

***Consensual Encounter***

No further Fourth Amendment seizure or detention occurs if an encounter between an officer and a driver ceases to be a detention and becomes consensual. *Bradford*, 423 F.3d at 1158. "A traffic stop may become a consensual encounter, requiring no reasonable suspicion, *if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority*." *Id.* (emphasis added). "Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter" and proceed on his or her own way. *Bradford*, 423 F.3d at

1158. (*quoting United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000)).[7]

The Tenth Circuit has held numerous times "that a police officer's continued retention of these documents takes the encounter out of the consensual realm, and into that of a stop requiring reasonable suspicion." *Angulo-Fernandez*, 53 F.3d at 1180; *see also United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994). In this regard, the Tenth Circuit has set forth a "bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him." *Bradford*, 423 F.3d 1158.[8]

In the case at bar, there is no dispute that Sgt. Bairett never returned to Seeley his driver's license, rental agreement, and/or issued a citation for speeding. Under the bright-line rule set out by the Tenth Circuit the traffic stop in this case, as a matter of law, never became a consensual encounter. The police conduct in this case would have conveyed to Seeley that he was not free to decline Sgt. Bairett's requests or otherwise terminate the encounter and proceed on his way.

A search preceded by a Fourth Amendment violation may remain valid if the

---

[7]Although an officer is not required to inform a suspect that she does not have to respond to his questioning or that she is free to leave, an unlawful detention occurs when the driver has an "objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way." *West*, 219 F.3d at 1176.

[8]However, the Tenth Circuit has also specifically ruled that the converse is not true:

> The return of a driver's documentation is not, however, always sufficient to demonstrate that an encounter has become consensual. *United States v. Elliott*, 107 F.3d 810, 813-14 (10th Cir. 1997). A routine traffic stop becomes a consensual encounter once the trooper has returned the driver's documentation so long as "a reasonable person under the circumstances would believe [she] was free to leave or disregard the officer's request for information." *Id*. at 814 (quoting *United States v. McKneely*, 6 F.3d 1447, 1451 (10th Cir. 1993)).

*Bradford*, 423 F.3d 1158.

consent to search was voluntary in fact under the totality of the circumstances. *McSwain*, 29 F.3d at 562 (*quoting Fernandez*, 18 F.3d at 881). However, "[t]he government bears the burden of proving the voluntariness of consent, and that burden is heavier when consent is given after an illegal detention." *Id.*; *see also United States v. Gregoire*, 425 F.3d 872, 879 (10th Cir. 2005) (holding that "the government bears the burden of proving voluntary consent under the totality of the circumstances."). While no single factor is determinative, "the temporal proximity of the illegal detention and the consent, any intervening circumstances, and, particularly, the purpose and flagrancy of the officer's unlawful conduct" are especially relevant. *McSwain*, 29 F.3d at 562 (*quoting Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975)). In *McSwain*, the first two *Brown* factors failed because, like in the case at bar, the consent occurred only a few minutes after the illegal detention without any intervening circumstance or event. 29 F.3d at 563. Likewise, in the case at bar, the only intervening circumstance was the threat to further illegally detain defendant while a K-9 unit was called and brought to the stop. Furthermore, the flagrancy of the officer's unlawful conduct and attitude towards defendants *ab initio* and throughout the stop weighs against possible purge of taint from the illegal detention.

Thus, as a matter of law there was no consensual encounter under the facts of this case. Manifestly, the government has failed to meet the higher burden to establish voluntary consent after an illegal detention.

***Validity of the Search of an Automobile without a Warrant: Requires Probable Cause – Not Merely Reasonable Suspicion***

Under the automobile exception to the Fourth Amendment's warrant requirement, it is well established that troopers "who have probable cause to believe there is contraband inside

an automobile that has been stopped on the road may search it without obtaining a warrant." *Florida v. Meyers*, 466 U.S. at 381, 104 S.Ct. 1852; *see also United States v. Oliver*, 363 F.3d 1061, 1068 (10th Cir. 2004); *Angulo-Fernandez*, 53 F.3d at 1180 (*citing Chambers v. Maroney*, 399 U.S. 42, 51-52, 90 S.Ct. 1975, 1981-82, 26 L.Ed.2d 419 (1970)). However, mere reasonable suspicion will not suffice. *Angulo-Fernandez*, 53 F.3d at 1180. Thus, if defendant did not consent to the search, as the court has so found in the case at bar, the trooper needed probable cause, not just reasonable suspicion, to search without a warrant. "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998) (internal quotation marks and emphasis omitted).

The few facts that had aroused the officer's suspicions in this case simply did not and do not now give rise to "the fair probability that contraband or evidence of a crime [would be discovered]" inside the car. *Angulo-Fernandez*, 53 F.3d at 1180 (*quoting Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). In *Bradford*, the court found that the trooper had probable cause to search the vehicle due to Bradford's confession to a pipe and marijuana, viewed by the trooper and the court as an attempt to circumvent a K-9 inspection by confessing to the marijuana. The court stated that "to conclude otherwise, we would create a perverse incentive for drug smugglers carrying large amounts of contraband to confess to small amounts of marijuana to avoid further inspection." *Bradford*, 423 F.3d at 1159. No such circumstances exist in the case at bar. In fact, rather than attempting to circumvent the K-9 inspection, defendant (involuntarily) relented and gave consent to the search at that point. Sgt. Bairett's reliance on the simple existence of one ordinary air freshener under normal use, and his

"inchoate suspicion or hunch" based upon nervousness fails to even meet the lower standard of reasonable suspicion. *A fortiori*, probable cause did not exist, and the search of the vehicle was invalid under the Constitution and jurisprudence of Tenth Circuit case law.

Based upon the foregoing, this court concludes that the trooper did not have an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring, nor did the initial detention ever become a consensual encounter. Manifestly, there was no probable cause to search without a warrant.

Accordingly, it is hereby:

**ORDERED**, that defendants' Motion to Suppress is Granted.

DATED this 14th day of December, 2005.

J. Thomas Greene

J. THOMAS GREENE
UNITED STATES DISTRICT JUDGE